# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Chapter 11** |
| **JODENE AUDREY PUFF,** | ) | |
| | ) | **Bankruptcy No. 10-01877** |
| Debtor. | ) | |

## ORDER ON OBJECTIONS TO CONFIRMATION OF PLAN

This matter came before the Court on objections to confirmation of Debtor Jodene Puff's Third Amended Chapter 11 Plan of Reorganization.  The Court conducted a confirmation hearing and took extensive post-hearing briefing.   At hearing, Jerrold Wanek represented Debtor, Jodene Puff.  Jeffrey Courter represented creditor Wells Fargo Financial Leasing ("Wells Fargo").  Mark Walz represented creditor JP Morgan Chase Bank, N.A. ("Chase").  John Freund represented Farmers Savings Bank Colesburg ("FSB Colesburg").  Larry Kudej represented the United States.  After hearing evidence and considering the arguments of the parties, the Court took the matter under advisement.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

## STATEMENT OF THE CASE

Debtor filed a Third Amended Plan of Reorganization on July 11, 2011.  Several secured creditors objected to the Plan.  They made a variety of arguments

against confirmation, including lack of feasibility.  The Court agrees with the creditors and finds that Debtor's Plan is not feasible.  The marginal monthly budget surplus presented in the Plan and Debtor's past history lead the Court to conclude the Plan is not feasible, and accordingly, it will not be confirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Debtor operates a hog confinement facility which includes three (3) barns that can each house at least thirteen hundred (1,300) head of hog.  Debtor has been engaged in hog confinement facility operations for over ten (10) years.  In addition to the hog confinement business, she owns a number of properties which she rents to third parties.

On July 1, 2010, Debtor filed a voluntary Chapter 11 petition.  She sought relief as a result of failed negotiations with her primary lender to restructure outstanding obligations.  She hoped to negotiate or obtain a Farm Service Agency loan.  During bankruptcy, certain vehicles have been sold, but no other significant asset sales have occurred.  Debtor has filed a Plan and Disclosure Statement which have been modified on several occasions.  On July 11, 2011, an amended Disclosure Statement was conditionally approved by the Bankruptcy Court.

The Plan proposes to pay creditors from cash-on-hand, operating income, and future income. The Plan includes four classes of secured claims and two

2

classes of unsecured claims.  It provides for full payment of administrative expenses, priority tax claims, and United States Trustee fees.

The Plan proposes to significantly reduce the secured portion of the secured creditor claims by using property valuations significantly lower than those proposed by the creditors.  The Plan provides for payment in full of reduced secured claims, over the course of 30 years at 4.25% interest.  Each secured claim is its own class under the Plan.  All unsecured claimants—including those formerly fully secured claimants that would have a large unsecured claim under the Plan valuations—will be paid approximately 1% of their claims, without interest, in semi-annual payments over five years.  All unsecured claims constitute one class under the Plan.  Under the Plan, Debtor would remain in possession of all property of the Estate moving forward.

The Plan also proposes to treat the claim of Wells Fargo Leasing as a secured claim based on the purchase of property, instead of a claim based on true leases.  This would significantly reduce the total pay-out to Wells Fargo Leasing.

One of the issues disputed by the parties is what portions of the claims are secured.  The parties dispute the valuation of Debtor's properties.  There are seven properties at issue.  For ease of understanding, the following table lists the property, a description of the property, and differing valuations:

| Property | Description | Debtor Valuation | Creditor Valuation |
|---|---|---|---|
| **1747 150th St.** | Hog Confinement Facility | $232,000.00 | FSB Colesburg- $290,000.00 |
| | House | $160,000.00 | Chase- Not Less than $277,000.00 |
| **1686 150th St.** | 26.5 acres Agriculture Land | $104,560.00 | FSB Colesburg- $126,195.00 |
| | Restaurant on 2 acres | $83,086.00 | FSB Colesburg- $111,693.00 |
| | Machine Shed | $30,541.00 | FSB Colesburg- $30,541.00 |
| | Homestead on 5 acres | $400,000.00 | FSB Walford- $400,000.00; FSB Colesburg- $417,000.00 |
| **1751 150th St.** | 17.23 acres Agriculture Land | $73,048.00 | FSB Colesburg- $173,000.00 |
| **1661 Grant Ave.** | Agriculture Land & Structures | $114,500.00 | FSB Colesburg- $114,500.00 |
| **6057 328th Ave.** | Lake Front Land | $8,000.00 | FSB Colesburg- $9,000.00 |
| **1643 Nolen Ave.** | 4.77 acres and Hog Facility | $460,393.00 | FSB Colesburg- $556,000.00 |
| | Grain Bin[1] | Unknown | United States- $15,000.00 |
| **1690 150th St.** | Parcel C | Unknown | (None Provided) |
| | Parcel D | $256,019.00 | (None Provided) |

Four creditors object to Debtor's Plan: Wells Fargo, FSB Colesburg, Chase, and the United States.  Wells Fargo is a secured creditor with interests in "Debtor's two (2) Hog Buildings and Machine Shed, a Mortgage Note, and three (3) separate

---

[1] There was testimony at the hearing that Debtor has sold this asset.

Mortgages securing the payment streams thereunder." (ECF Doc. 173, at 1.)

Wells Fargo

> has three (3) separate claims against Debtor as set forth in its Proof of Claim in the amount of $416,000.35, filed September 29, 2010 as Claim #18 ("POC"), defined as follows: 1) mortgage note #007-0068759-004 ("Note") in the amount of $14,480.59, which is secured by its first mortgage upon Debtor's 4.77 acres located at 1643 Nolen Avenue upon which [Wells Fargo's] Hog Buildings sit . . . (Debtor has made $402.34 monthly adequate protection payments to [Wells Fargo] on the Note since June of 2010); 2) Shed lease #007-0068759-003 . . . in the amount of $15,100.50, which is located at 1747 150th Street . . . (Farmers Savings Bank-Colesburg . . . has first mortgage upon [this property] of $104,838.97 thereon per its Proof of Claim); and 3) Hog Buildings lease #007-0068759-006,007 . . . in the amount of $386,419.26 on the two (2) 1,300 head Hog Buildings located on [1643 Nolen Avenue], which is secured by [Wells Fargo's] second mortgage on [1643 Nolen Avenue], which is junior to [Well's Fargo's] first mortgage on [1643 Nolen Avenue] securing the Note, and is further secured by a second mortgage on [1747 150th Street] behind Colesburg's first mortgage thereon.

(Wells Fargo, ECF Doc. No. 173, at 1—2.)

FSB Colesburg holds mortgages on the following properties: (1) the hog confinement facilities at 1747 150th St.; (2) 26.5 acres of agricultural land at 1686 150th St.; (3) restaurant and machine shed at 1686 150th St.; (4) real property on five (5) acres at 1686 150th St. (second mortgage); (5)17.23 acres of agricultural land  at 1751 150th St.; (6) agricultural land and structures at 1661 Grant Ave.; (7) lake-front property at 6057 328th Ave.; and (8) parcels C and D, at 1690 150th St. Based on Debtor's appraisals, a significant portion of this debt would become

unsecured.  FSB Colesburg lists a secured claim against Debtor in the amount of $1,237,204.08, plus interest, costs, and fees.

Chase is a holder of a secured claim in the amount of $289,633.90, through a first mortgage on the home at 1747 150th Street.  The United States, through the Commodity Credit Corporation, has a security interest in the grain bin located at 1643 Nolen Avenue in the amount of $3,069.54.

Under the Plan, Debtor intends to:

> continue to operate her hog facility and farming operation.  No changes in management are contemplated, nor are additional employees expected to be hired.  Income of the Debtor will be limited to the satisfaction of those expenses listed in the budget provided in the Amended Monthly Plan Budget . . . and any additional operational expenses of the Debtor to continue the business.

(Plan, ECF Doc. No. 148, at 20.)

> The debtor anticipates accumulating adequate cash for payments to be made on the Effective date of the plan.  This is based upon the revenue generated from Debtor's business and Hog Barn facilities proceeds, the rent on a house and lake property, coupled with funds to be received from a Farm Services Agency disaster relief program.

(Id. at 16 (footnote omitted).)

With regard to Plan feasibility, Debtor states:

> 1. *Ability to Initially Fund Plan*  The Plan Proponent believes that the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses that are entitled to be paid on that date.  The amount of cash on hand currently, coupled with funds to be received from the Farm Services Agency disaster relief program, will permit Debtor to satisfy all necessary cash outflows as of the Effective Date.

6

> *2.    Ability to Make Future Plan Payments and Operate Without Further Reorganization . . . .* The financial forecast attached to this Disclosure Statement demonstrates that the Debtor is financially viable, given the protections that filing for bankruptcy provides. Using conservative estimates, Debtor is well positioned for continued consistent earnings.

(Fourth Amend. Disc. Stat., ECF Doc. No. 147, at 14.)

Debtor currently rents out the home at 1747 150th street to her son. She testified that her son pays her $700.00 a month in rent. The Plan calls for payment to Chase, on its mortgage on this property, of $787.10 a month for 30 years. Debtor indicates she is renting out the agricultural land at 1751 150th Street and 1686 150th Street for $847.50 monthly. She rents the restaurant facilities at 1686 150th Street for $400.00 per month. She rents the machine shed on 1686 150th Street out for $200.00 per month. She receives rent from the agricultural land and structures at 1661 Grant Avenue in the amount of $650.00 per month. She also rents a "Home bin" out for $100.00 per month, the Court assumes this property is located at 1686 150th Street. She lists a monthly income from the hog barns of $11,558.00. Her projected total monthly income is $13,755.50. Her operational and household expenses before Plan payments total $5,720.00 per month. Under her monthly budget (Exhibit A), she would make payments of $7,844.12 to creditors each month. Under the Plan, however, her monthly payment to creditors is $8,007.92. Debtor's proposed monthly budget failed to take into account the

7

$787.10 monthly payment to Chase under Class 2.  Further, the Court notes there is a discrepancy between Debtor's budget and the Plan as to Class 4(A) and Class 4(B), FSB Colesburg's claims.

Debtor's "Means of Execution" states that at the effective date of the Plan there will be a Cash Total of $18,370.00, monthly payments to classes of $8,007.92[2], and semi-annual payments of $627.90.  She acknowledged regular operating expenses.  In order to meet all these payments and expenses, Debtor states:

> The debtor anticipates accumulating adequate cash for payments to be made on the Effective date of the plan.  This is based upon the revenue generated from Debtor's business and Hog Barn facilities proceeds, the rent on a house and lake property, coupled with funds to be received from a Farm Services Agency disaster relief program.  The hog operation encompasses three barns, each barn holding 1,300 head of hogs.  Two barns are located on a separate real estate parcel, and the third barn is located within 100 yards of Debtor's residential rental property at 1747 150th Street (hereafter, home barn).  Debtor currently receives $34.50 per pig space (annually) at the home barn, and $36 per pig space (annually) at the other barns, for a total monthly payment amount from Innovative Ag Services Co. of $11,558.00 (identified as Hog Barn Proceeds on Exhibit C).  The contracts with Innovative Ag Services Co. provide a guaranty of at least $7,800.00 per month for the two non-home barns through April 15, 2012.  The rental property at 1747 – 150th Street receives $700.00 per month, and the Lake property rents for $1200.00 annually.
>
> Debtor does not anticipate a wholesale liquidation of properties, however, any real estate transaction which proves commercially prudent and which would further advance the interests of Debtor and

---

[2] As noted above, the specific Plan payments provide for a monthly payment of $8,568.94.

creditors shall be in conformance with the reorganization concept and this Plan.  Any additional proceeds shall be applied to the operating budget.  In the event of a sale of such property or asset, any tax obligation would necessarily recapture depreciation to the extent required by the Internal Revenue Code.  Moving forward, taxes will be paid on an on-going basis in compliance with the requirements of the taxing authorities, and that provisions have been made in the Debtor's budget for tax payment set-asides.  Debtor is not currently delinquent on [any tax] payments.

Payments to creditors over time shall be funded through operating revenues from the continued operation of the business. Creditors receiving monthly payments shall be paid on the fifteenth (15th) of each month.

(Plan, ECF Doc. No. 148, at 17.)

Debtor has an available Plan Income of $8,035.50.  Her budget proposes to pay creditors $7,844.12 per month.  Her Plan proposes, however, to pay $8,568.94 per month.  Debtor's documentation thus creates some confusion.  The Plan income minus creditor payments pursuant to the budget creates a $191.38 "cushion" each month.  However, Plan income minus proposed payments, pursuant to the Plan, leave a $533.44 deficit.  Further, Debtor's Plan does not provide any expense for home repairs.

The creditors have lodged several objections to the Plan.  The creditors argue that the Plan is not proposed in good faith under § 1129(a)(3); Debtor has not obtained proper approval for payments under § 1129(a)(4); Debtor has not acted in the best interest of creditors  under § 1129(a)(7); the Plan engages in an improper cram-down under § 1129(a)(8) and § 1129(b);  the Plan is not feasible under

§1129(a)(11); the Plan includes retention of property that is unnecessary for an

effective reorganization under §362(d)(2); the Plan violates the Code's anti-

modification rules under §1123(b)(5); and the Plan does not provide all net

disposable income to creditors under § 1129(a)(15)(b).  Because the Court finds

that the Plan itself is not feasible, the Court will not address the creditors'

remaining objections.

## CONCLUSIONS OF LAW AND DISCUSSION

### A.    Plan Confirmation – 11 U.S.C. § 1129(a) & Feasibility

"Only a plan that meets the requirements set forth in § 1129(a) can be

confirmed.  11 U.S.C. § 1129(a).  Except for § 1129(a)(8), each of the

requirements is mandatory."  In re View Cleveland, LLC, No. 09-55035, 2010 WL

5240044, at *1 (Bankr. N.D. Ohio Oct. 25, 2010).  "Subsection 1129(a) [of the

Bankruptcy Code] provides the requirements that a plan must meet in order to gain

confirmation from the Bankruptcy Court.  11 U.S.C. § 1129(a) ('The court shall

confirm a plan only if all of the following requirements are met . . . .')."  In re

Philadelphia Newspapers, LLC, 599 F.3d 298, 321 (3d Cir. 2010).  "In order to

confirm a Chapter 11 Plan, the Court must find that each of the required elements

of 11 U.S.C. § 1129(a) have been met."  In re Gilbertson Rest. LLC, No. 04-00385,

2005 WL 783063, at *4 (Bankr. N.D. Iowa Apr. 4, 2005) (citing In re Internet

Navigator Inc., 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003)); see also In re

10

Riverbend Leasing LLC, 458 B.R. 520, 525 (Bankr. S.D. Iowa 2011); In re Reuter,

427 B.R. 727, 769 (Bankr. W.D. Mo. Apr. 14, 2010); In re Bryant, 439 B.R. 724,

738-39 (Bankr. E.D. Ark. Oct. 8, 2010).

"The proponent of the plan bears the burden of proof with respect to each

element of § 1129(a) under a preponderance of the evidence standard." In re

Gilbertson Rest. LLC, 2005 WL 783063, at *4 (citing In re Internet Navigator Inc.,

289 B.R. at 131; In re Briscoe Ent., Ltd. II, 994 F.2d 1160, 1165 (5th Cir. 1993)).

Section 1129(a) specifically requires that a plan be proposed in good faith.  11

U.S.C. § 1129(a)(3).

The feasibility requirement is found in § 1129(a)(11).  "Section 1129(a)(11)

provides that the court shall confirm a plan only if '[c]onfirmation . . . is not likely

to be followed by liquidation, or the need for further financial reorganization, of

the Debtor . . . unless such further . . . reorganization is proposed in the plan.'"  In

re Monnier Bros., 755 F.2d 1336, 1341 (8th Cir. 1985) (quoting 11 U.S.C.

§1129(a)(11)); see In re Danny Thomas Prop. II Ltd. P'ship, 241 F.3d 959, 962

(8th Cir. 2001).  "One of the requirements for confirmation is that the debtor 'be

able to make all payments under the plan and comply with the plan.'"  In re

Richards, No. 03-02487, 2004 WL 764526, at *2 (Bankr. N.D. Iowa Apr. 2, 2004)

(quotation omitted).  The Eight Circuit has held that "'[i]n determining whether [a

plan] is feasible, the bankruptcy court has an obligation to scrutinize the plan

carefully to determine whether it offers a reasonable prospect of success and is

workable.'"  In re Monnier Bros., 755 F.2d at 1341 (quoting United Prop., Inc. v.

Emporium Dep't Stores, Inc., 379 F.2d 55, 64 (8th Cir. 1967)); see In re Gilbertson

Rest., 2005 WL 783063, at *5.

The Court has addressed the feasibility analysis in detail as follows:

> To determine the feasibility of a plan, the court must ascertain the
> probability of actual performance of the provisions of the plan.  In re
> Mosbrucker, 227 B.R. 434, 437 (B.A.P. 8th Cir. 1998), aff'd 198 F.3d
> 250 (8th Cir. 1999).   Feasibility of a Debtor's plan is a factual
> determination.  Id.
>
> This feasibility standard requires the Court to determine
> whether the plan offers a reasonable prospect of success and is
> workable.  In re Monnier Bros., 755 F.2d 1336, 1341 (8th Cir. 1985).
> The test is whether the things which are to be done after confirmation
> can be done as a practical matter under the facts.  In re Clarkson, 767
> F.2d 417, 420 (8th Cir. 1985).
>
> The Eighth Circuit's feasibility test considers whether
> provisions in a plan are achievable given the unique facts of the case.
> In re Bowman, 253 B.R. 233, 238—39 (B.A.P. 8th Cir. 2000).  This
> Court will only approve a plan if it has a rational likelihood of
> success.  In re Danny Thomas Prop. II Ltd. P'ship, 241 F.3d 959, 963
> (8th Cir. 2001).

In re Richards, 2004 WL 764526, at *2—3.  Success of the plan, however, need

not be guaranteed.  In re Monnier Bros., 755 F.2d at 1341 (citing 5 Collier on

Bankruptcy ¶ 1129.02, at 1129—33).  "Courts generally grant debtors every

reasonable benefit of the doubt in matters concerning plan feasibility in furtherance

12

of the rehabilitative policies underlying the Code." In re Richards, 2004 WL 764526, at *3.

### B.    Debtor's Plan is not Feasible Under 11 U.S.C. § 1129(a)(11)

The current Plan is not feasible for several reasons. First and foremost, if the payments listed in Article IV of Debtor's Plan are accurate and the budgeted monthly income and expenses in Exhibit A are accurate, Debtor would be operating at a monthly loss of $533.44 per month. This deficit occurs even without factoring in the semi-annual payment to unsecured creditors of $627.90. Even if the Court were to accept the monthly totals listed in the Plan, when considered with Debtor's budgeted income and expenses—viewed in combination with her past monthly reports—the Plan is not feasible. Finally, each of the creditors presents persuasive arguments that the Plan is not financially feasible, both as a whole and with regard to specific claims. The Court will first identify the arguments presented by each creditor, and Debtor's argument in support of the Plan's feasibility before discussing in greater detail why the Plan is not feasible

The United States argues the Plan is not feasible based upon consideration of valuation issues, historic losses of Debtor's operations, month reports, lack of long-term hog contracts or leases, as well as lack of specific plans as to how buildings will be maintained and costs contained over the next thirty (30) years. In support of this conclusion, the United States cites to In re American Trailer &

Storage, Inc., 419 B.R. 412, 423 (Bankr. W.D. Mo. 2009), which referenced

feasibility factors courts should review, including projected income and expenses

in relation to actual past performance.

Chase argues that even accepting Debtor's arbitrary valuation of the

property securing its claim, the Plan is not feasible.  Chase argues

> Net rental income derived from the 1747 150th St. property is no
> more than $700.00 times 12, or $8,400, less $3,050 in annual taxes,
> $1,000 insurance costs and $1,000 in maintenance or $3,350.00.  In
> order to service the Class 2 debt to Chase, the Debtor requires $787.00
> times 12 or $9,444.00, leaving a $6,094.00 annual shortfall for each of
> the 30 years of the plan.  This shortfall over the life of the Plan is
> $182,820.00.  The Debtor testified that she did not know where she
> had positive cash from other operating properties that would allow her
> to make up the $6,094.00 annual shortfall.  The Debtor has no
> unencumbered property.  It is readily apparent therefore that the plan
> depends on the unauthorized use of other lender's cash collateral.  The
> rents and profits from the other Puff properties are cash collateral for
> the other lenders and not subject to invasion to cover the $182,820.00
> shortfall over the life of the plan.
>
> Moreover, if the property is valued correctly the debtor cannot
> afford the payments.  Jody Puff testified she cannot afford the
> payments at the cont[r]act rate of $1,540.72 per month.  The best
> illustration of the lack of feasibility of the Plan is the performance of
> the Debtor since this case was filed.  The Debtor testified that she had
> made only a single payment of $700.00 to Chase since the date of
> filing.  Notwithstanding the absence of this debt service to Chase (and
> similar failure to adequately protect other secured creditors) Debtor
> has not amassed any significant savings . . . .

(Chase Br., ECF Doc. No. 175, at 5—6.)

FSB Colesburg's overarching objection is that Debtor has under-valued real

property values by a total of $782,194.00.  With regard to feasibility it argues:

Debtor has demonstrated through her monthly reports that she is unable to produce enough revenue to service the debts on her properties and to cover her monthly living expenses, even at the discounted values she utilizes for most of her real estate holdings. Debtor's ability to generate cash is poor, as best.   The following scenario illustrates this likely liquidation scenario best.

1.      Debtor proposes to pay Wells Fargo Financial Leasing, Chase, Farm Services Agency, Farmers Savings Bank, and general unsecured creditors a combined total of $5,847.64 per month under the plan. . . .

2.      During the pendency of this action, the only payments made by Debtor to any of the above parties has been $402.34 per month to Wells Fargo Financial Leasing, meaning that Debtor must make payments of $5,445.30 more per month under the Plan than she made from July, 2010 to the present, which is the equivalent of $76,234.20 from July 2010 through August 2011.

3.      Debtor's first monthly report, Docket No. 32, shows total cash of $6,709.59, and her last monthly report, Docket No. 170 shows ending cash of $25,928.90 (which includes the "cash on hand" of $14,175.00) as of August 30, 2011, meaning that she has generated $19,219.31 in cash over 14 months, without paying $5,445.30 per month to her creditors.

4.      Had Debtor attempted to make payments under her own plan from July 2010 through August 2011, she would have fallen short by $57,014.89.   Even the grain bin rent of $9,000.00 still leaves a shortfall of $48,014.89.

5.      Debtor's shortfall would have been even greater had she not received the one-time crop disaster payment from the FSA in the amount of $20,696.00.    That shortfall would have been $77,710.89 ($68,710.89 when the annual grain bin rental of $9,000.00 is added back in).

. . . .

With the exception of the $9,000.00 (annually) in grain bin rental, there is no "new" proposed income in the Plan.  In other words, Debtor's monthly reports, to date, provide all of the financial data that

the Court or an interested party need examine to determine whether the Plan is feasible.  In short, those financial numbers, plus $9,000.00 per year, constitutes Debtor's revenue, and that revenue and Debtor's monthly expenses (again, outlined in the monthly reports) is insufficient to provide enough cash for the Plan to function.

(FSB Colesburg, ECF Doc. No. 176, at 9—11.)

Wells Fargo argues in part that the Plan is infeasible because:

Debtor has understated her monthly payment requirements to [Wells Fargo] by nearly $3,990.  While she currently has a razor-thin monthly budget excess of only $227, she will immediately be over $3,600 in the hole monthly just to [Wells Fargo], and she has similarly "shorted" the monthly payment requirements to Colesburg and also to JP Morgan Chase Bank.  Second, it is not practical to assume that Debtor could make her Plan payments even if she was able to improperly reduce [Wells Fargo's] monthly payment to $2,425.56 as proposed.  During the Confirmation Hearing, Colesburg's counsel argued, and set forth in their Objection to Confirmation, that after one year of not paying Colesburg a dime (and under the Plan, Debtor's annual payments to Colesburg would be over $37,000), Debtor accumulated from the operation of her business minimal cash in the amount of <u>only $8,759.63</u>.  Clearly Debtor's Plan is destined to fail in a few short months and then require liquidation or further failed reorganization.

Despite favorable hog market conditions, Debtor's operational history during her past year in Chapter 11 has shown a woeful inability to generate sufficient cash to fund her monthly payment obligations under the Plan.  <u>While it is true Debtor's Plan does not have to guarantee success, it is also true that when her Plan and past year's operating history virtually guarantee failure, it is not feasible!</u>  Debtor's argument that she will have substantially improved cash flow by reduced payments to the secured creditors, and that she has the ability to make individualized choices for expenses and spending based on her future cash flow needs and availability, is pure speculation and completely ignores the fact that for the last year, she has not even been able to meet her own household budget!  It is pie in the sky thinking to believe that if only her Plan is confirmed, Debtor will somehow be able to miraculously change her past operating

16

history and generate cash flow surpluses when she will be required to actually make debt service payment to the secured creditors.

Finally, as noted in the various Objections to Confirmation filed by the various creditors.  Debtor's Plan, despite having a razor-thin monthly surplus of only $227.58, makes no allowance for maintenance, repairs, replacement of feeding/watering equipment, pens, or other equipment necessary to maintain a hog operation.

(Wells Fargo Br., ECF Doc. No. 173, at 14—15.)

Debtor's arguments on feasibility are not persuasive.  Debtor argues the Plan is feasible on the following rationale:

Each of the creditors that object to feasibility fails to consider the following three (3) points that favor the success of Jodene Audrey Puff:

1.      The strength of the Hog Market such that buildings over the foreseeable future have significantly high demand, thereby assuring the strength of her income for the foreseeable future;

2.      The substantially improved cash flow by the reduced payments to the secured creditors under the restructuring of the Plan; and

3.      The ability of Jodene Audrey Puff to make individualize choices for expenses and spending based upon cash flow needs and availability.

. . . .  No creditor has doubted the monthly income figures she has presented to this Court and in fact the only other witness in the trial seems to suggest that the income was quite sustainable given his experience with hog buildings.  The Bankruptcy Code has a built-in-bias favoring reorganization over liquidation.

(Debtors' Brief, ECF Doc. No. 169, at 9.)

Debtor even attempted to specifically respond to both Chase and Wells Fargo on their feasibility arguments.  In response to Chase, Debtor argues:

Even though the expenses associated with that [the home on 1747 150th Street] alone may exceed the rental income from the property alone, as explained by the Debtor, there are other desirable reasons for

> retaining the property, including the proximity to livestock barns
> which are the primary income source for Debtor.  Accordingly, her
> son, who is the tenant in the property, and assists in the maintenance
> of the livestock, can be proximately close to the livestock facility if
> Debtor retains the property.  Although Chase Home Finance has a
> mortgage on a particular identifiable area: the entire property,
> including the livestock barns, was designed as one.  As such, allowing
> the property to separate would have driveway access problems, a
> circumstance where both properties are serviced by one water well
> and other logical issues if the Debtor could not retain same.

(Debtor Reply, ECF Doc. No. 187, at 6.)  In response to Wells Fargo, Debtor

argues:

> Wells Fargo's entire argument is predicated upon the assertion that its
> claim will require payments of an additional $3,600.00 (thirty six
> hundred dollars) based upon the assumptions that it has made in its
> brief.  Those assumptions are not supported by the Proof of Claim of
> Wells Fargo and therefore the Court cannot nor should it take those
> assumptions into account.  Wells Fargo correctly observes that there is
> a favorable hog market that essentially assures the immediate and
> intermediate success of the Plan and the correctness of Debtor's
> assumptions in formulating her budget.

(Debtor's Reply, ECF Doc No. 187, at 9.)

While Debtor appears to be fully committed to the Plan, Debtor's

commitment does not demonstrate ability to make the Plan a success.  This

commitment is not enough to persuade the Court that under a preponderance of the

evidence this Plan is feasible.  See In re Monnier Bros., 755 F.2d at 1341.

In analyzing feasibility, the time between the filing of this Chapter 11 and

the Plan Confirmation Hearing is revealing.  During that period, Debtor generated

only $8,759.63, while not making many of her monthly payments.  This figure is

taking into consideration the $20,696 Farm Services Agency (FSA) payment. Without the FSA payment, Debtor's cash flow would appear to be -$11,936.37.

Debtor's monthly reports show that she is not able to maintain the monthly expense budget she is proposing. Debtor's inability to generate meaningful cash reserves over this fourteen (14) month period strongly suggests she will be unable to sustain the Plan unless she lives in a manner substantially different than she has since July of 2010. FSB Colesburg estimated that if Debtor continued in the same manner she has since filing, she falls short $68,710.89 per year.

The Court agrees with creditors that in this case, the recent past is the best indicator of the future. Here, the recent past reveals that the current Plan is infeasible. See In re Inv. Co. of Sw., Inc., 341 B.R. 298, 311 (B.A.P. 10th Cir. 2006) ("A glaring discrepancy between the facts surrounding past performance and activity and predictions for the future is strong evidence that a debtor's projections are flawed and the plan is not feasible."); In re Young Broadcasting Inc., 430 B.R. 99, 129 (Bankr. S.D.N.Y. 2010) (same); In re Berry, 266 B.R. 359, 364—65 (Bankr. N.D. Ohio 2000) ("[P]robably one of the best indicators of what will occur in the future, comes from events that have occurred in the past.").

Debtor also does not appear to have the additional revenues needed to guard against eventual liquidation. Debtor does not put any money away for future expenses that are virtually certain to come. Debtor provided testimony at the

19

hearing about the condition of her buildings, the price of hogs, and the potential

increase of value of both the building and operation.  These positive attributes,

however, do not outweigh the concrete feasibility and cash-flow issues that Debtor

currently faces.  The Plan calls for payments over 30 years.  FSB Colesburg

argues, and the Court concurs, that "a 30-year amortization with respect to any hog

operation is not fair and equitable, since the feeders, gating, curtains, and other

required capital assets do not have a useful life of thirty (30) years."  (FSB

Colesburg, ECF Doc. No. 154, at 2.)  Not only is the primary source of income—

the rental of hog space—subject to fluctuation given the condition of the market,

Debtor has provided insufficient allowance for the reasonable maintenance,

repairs, or replacement issues that are virtually certain to come.  Expert testimony

from FSB Colesburg indicates that, while the market is profitable right now, this

could—and likely will—change over time.  There is no evidence from Debtor

regarding these eventualities.  Debtor is really projecting an unrealistic optimist

basis.  She proposes a budget that—even in a reading most favorable to Debtor—is

razor thin and provides nothing in the way of cushion for the down years and

expenses that will inevitably arise.

Other evidence, in the form of Mr. White's testimony, further supports a

conclusion that the Plan is infeasible.  Mr. White testified: (a) if the property

values are as low as she claims, then there are significant upkeep expenses she has

failed to account for; and (b) if the property values are as high as FSB claims, then there is <u>potential</u> for greater revenue.  Debtor has not shown that she can satisfy that potential.  The creditors also presented evidence that non-farm employment would be necessary to make the operation anywhere close to feasible.  While at the Disclosure Statement hearing Debtor indicated a willingness to obtain such employment (evidenced by pending employment applications), her testimony at the time of the confirmation hearing indicates she no longer plans to supplement her available income with non-farm employment.  While revenue potential might exist, the Court finds that Debtor's current Plan fails to adequate show a basis for reaching that potential.

The Court also notes that Debtor appears to treat the Wells Fargo leases as a disguised security interest.  Debtor's treatment of Wells Fargo's claim in that manner is also critical to the Plan.  Debtor has failed to present any evidence to support this bald assertion—that the leases are really security interests.  While the feasibility of the Plan is lacking even if the Court assumes Debtor could convert Wells Fargo's claim in this fashion, the Plan still fails on feasibility for the reasons stated above.

### C.     Remaining Arguments

The totality of the evidence shows the Plan is not feasible.  A Plan that is not feasible cannot be confirmed under § 1129(a)(11).  Because the Court finds that the feasibility issue is dispositive, the Court need not address the remaining issues.

For the reasons stated above, the Court finds that the plan is not feasible and thus not confirmable under 11 U.S.C. § 1129(a)(11).

**WHEREFORE**, the objections to Debtor's Third Amended Chapter 11 Plan Confirmation are **SUSTAINED** and confirmation of Debtor's Third Amended Chapter 11 Plan (ECF Doc. No. 148) is **DENIED**.

**FURTHER,** Debtor shall file a Fourth Amended Plan within sixty (60) days of the date of this order.


Dated and entered:  March 23, 2012

_____
THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE